IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GREG de VRIES, an individual, and RAYMOND MURRAY, an individual, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 9782-ML |
| v. | ) ) ) | |
| DIAMANTÉ DEL MAR, L.L.C. | ) ) | |
| Defendant. | ) | |

MASTER'S REPORT
(Plaintiffs' Motion to Compel)

Date Submitted: March 11, 2015
Final Report: June 3, 2015


Stamatios Stamoulis, Esquire and Richard C. Weinblatt, Esquire of STAMOULIS & WEINBLATT, L.L.C., Wilmington, Delaware; Steven R. Main, Esquire and Christopher T. Hill, Esquire of HILL, RUGH, KELLER & MAIN, P.L., Orlando, Florida; Attorneys for Plaintiffs.

Joanna J. Cline, Esquire and James G. McMillan, III, Esquire of PEPPER HAMILTON, L.L.P, Wilmington, Delaware; OF COUNSEL: Thomas McC. Souther, Esquire of PEPPER HAMILTON, L.L.P., New York, New York; Attorneys for Defendant.



LEGROW, Master

The operating agreement of a limited liability company requires the managing member to prepare and provide to the other members certain quarterly and annual reports. In the last five years, the managing member has ignored that obligation. During that same period, the managing member caused the company to surrender its only asset to satisfy a debt with a balance approximately one-twentieth the value for which the asset previously appraised. The managing member had personally guaranteed that debt and the property transfer extinguished that personal guarantee.

Shortly after the transfer, two members of the limited liability company demanded to inspect the company's books and records to value their investment and investigate possible mismanagement. At the time, the members were unaware the asset had been surrendered. The company granted the inspection, but withheld privileged documents. It is undisputed that the company's non-privileged documents do not provide any information about the events or decision-making process that ultimately led to the surrender of the company's only asset. The plaintiffs therefore moved to compel the production of privileged documents under the fiduciary exception to the attorney-client privilege. Because they have shown good cause to inspect some of the documents on the privilege log, I recommend that the Court grant in part the motion to compel. This is my final report.

**BACKGROUND**

Diamanté Del Mar, LLC ("DDM") is a limited liability company organized under the laws of Delaware with its principal place of business in Danbury, Connecticut.[1] DDM was formed in September 2002 along with its wholly-owned Mexican subsidiary for the purpose of acquiring the rights to approximately 10,000 acres of undeveloped land, including three miles of Pacific coastline in El Rosario, Baja California, Mexico (the "Property").[2] DDM's managing member is Baja Management, LLC ("Baja").[3] Kenneth A. Jowdy ("Jowdy") serves as Baja's President and sole managing member and, as such, has control over the day to day operations of DDM.[4] Baja owns a 93% interest in DDM.

DDM expected to develop the Property in three phases. The initial phase would include construction of a hotel and residential properties, as well as roads, a golf course, and a club house, and was estimated to cost $65 million.[5] A report prepared by KPMG in 2005 indicated DDM was seeking a $20 million loan to fund this phase of the development.[6] Phases two and three would produce

---

[1] Pls.' Verified Compl. ¶ 3.
[2] *Id.* at ¶¶ 4, 9.
[3] *Id.* at ¶ 5.
[4] *Id.*
[5] *Id.*, Ex. B ("KPMG Report") at 4-6.
[6] *Id.*

additional recreational facilities such as a spa, tennis complex, fitness centers, a winery and vineyards, and an equestrian center.[7]

The plaintiffs, Greg deVries and Raymond Murray, each invested $500,000 in DDM pursuant to subscription agreements dated April 14, 2004 and March 29, 2005 respectively, and each received a 0.5% class A membership interest in the company.[8] At the time, the plaintiffs were professional ice-hockey players in the National Hockey League.[9] In all, 14 individuals invested $500,000 each in DDM. Under DDM's operating agreement (the "Operating Agreement"), Baja was required to prepare annual and quarterly reports and transmit to DDM's non-managing members unaudited financial statements and quarterly business reports.[10] The quarterly business reports never were prepared and the plaintiffs have not received any reports or statements since at least 2010.[11]

DDM obtained clear title to the Property and permits to complete the aforementioned renovations, but the Property remains largely undeveloped.[12] An appraisal performed by KPMG in April 2005 valued the Property at $68.9 million and reported that DDM had:

---

[7] *Id.*
[8] *Id.* ¶ 3.
[9] *Id.* at ¶¶ 1-2.
[10] Motion to Compel Production of Documents and Challenging Def.'s Privilege Log (Pls.' Br.), Ex. C, § 502.
[11] Pls.' Br. at 3. *See also* Pls.' Br., Ex. D (e-mail from DDM counsel dated November 4, 2014 confirming that the quarterly business reports do not appear to exist).
[12] *Id.* at ¶ 7.

> [G]ood, clear, marketable, insurable title to three parcels of land that comprised 8,065 of the 9,727 total acres … [and DDM] expects to obtain fee simple title on the three parcels that comprise 1,218 acres three to six months after the date of value.  This transfer would bring the total acreage held in fee simple estate to approximately 9,283 acres."[13]

The report also stated that as of June 2005, the Property had no encumbrances.[14]

On February 21, 2006, DDM secured – with Jowdy's personal guarantee – a loan for $3 million from KSI Capital Corp. ("KSI"), a "hard money lender."[15]  The plaintiffs were not aware of the loan or its terms at the time the Property was encumbered.[16]  DDM paid its required interest-only payments on a monthly basis up to and including July 2009.[17]  DDM did not, however, obtain any of the additional funds necessary to develop the Property.[18]

On June 18, 2009, the plaintiffs, along with DDM's twelve other individual members, filed suit against Jowdy in the Superior Court of California, alleging claims for breach of fiduciary duty and fraud (the "California Action").[19]  The California Action included allegations that the KSI loan constituted

---

[13] KPMG Report at 4-6.

[14] *Id.*

[15] Def.'s Opposition to Pls.' Mot. to Compel ("Def.'s Br.") at 4.  Hard money loans carry high interest rates and typically are secured by real estate.

[16] Pls.' Br. at 9.

[17] The total amount DDM paid is approximately $1.5 million.

[18] *Id.* DDM attributes its inability to secure any other financing for the project to the global financial crisis.  Def.'s Br. at 4.

[19] Def.'s Br., Ex. A.

mismanagement by Baja and Jowdy. The suit voluntarily was dismissed in February 2010.[20]

In January 2010, KSI sued DDM, the Mexican subsidiaries, and Jowdy in the United States District Court for the District of New Jersey, alleging claims for breach of contract stemming from the default on the $3 million loan (the "KSI Action").[21] The parties settled the KSI Action on November 15, 2010. The plaintiffs were not aware of the KSI Action or its settlement and dismissal.

Under the settlement agreement, Jowdy and DDM executed confessions of judgment for the full amount of the loan and interest.[22] KSI agreed to hold the judgments in escrow until April 2011 to allow DDM time to obtain financing to satisfy the KSI loan. When DDM did not obtain financing, Baja and Jowdy reached a new agreement with KSI. Under that agreement, DDM executed documents transferring the Property to KSI in lieu of KSI recording the judgments against DDM and Jowdy.[23] Those transfer documents were held in escrow for a brief time, to allow DDM a final opportunity to satisfy the loan, but DDM ultimately surrendered the Property to KSI in September 2013.[24]

---

[20] *Id.*, Ex. B.
[21] Pls.' Br., Ex. G; Def.'s Br. at 6.
[22] Pls.' Br., Ex. K, L.
[23] *Id.*, Ex. M.
[24] *Id.*, Ex. E.

The plaintiffs were not aware of these agreements or the transfer of the Property until they made a demand on May 30, 2014 to inspect DDM's books and records (the "Demand"). In the Demand, the plaintiffs stated the purpose of their inspection was to "conduct a current valuation regarding their respective ownership interests in DDM, and to further investigate whether there has been any mismanagement of DDM, especially as it relates to the $3,000,000 loan received from [KSI] in or around February of 2006."[25] When DDM did not provide the requested books and records for inspection, the plaintiffs filed this action on June 18, 2014, to enforce their inspection rights under the Operating Agreement and 6 *Del. C.* § 18-305.

After this action was filed, the parties reached a settlement and DDM produced non-privileged books and records responsive to the Demand. When they obtained the records, the plaintiffs learned for the first time about the terms of the settlement with KSI and the later transfer of the Property. The plaintiffs also discovered that on June 27, 2014, DDM canceled its status as an active limited liability company.[26] According to the plaintiffs, the books and records produced in response to the Demand do not answer several key questions, including why the litigation was settled, why Jowdy entered into revised agreements with KSI in

---

[25] Pls.' Verified Compl., Ex. I, at 3.
[26] Pls.' Br. at 4-5.

6

2012, or why the Property, which once appraised for more than $60 million in its undeveloped state, was transferred to KSI to satisfy a $3 million debt.

In addition to producing non-privileged books and records, DDM also provided the plaintiffs a privilege log listing the documents DDM had withheld or redacted on the basis of privilege. The log included 95 documents, 41 of which were withheld in their entirety and 54 of which were redacted.[27] The documents on the privilege log all were created between 2010 and 2012, aside from seven redacted documents relating to this litigation. The privileged documents involved communications between Jowdy, William Najam ("Najam"), Jowdy's brother-in-law and the former Vice President and General Counsel of DDM, and several outside counsel representing DDM and Jowdy on a variety of matters. The plaintiffs do not dispute that the documents on the log are privileged. They argue, however, that they should be entitled to inspect all those documents under the *Garner* doctrine.

The plaintiffs filed this motion to compel asserting they should be allowed to inspect all the documents on the privilege log. The plaintiffs argue that the specter of mismanagement and self-dealing hangs over Jowdy's agreements with KSI because of Jowdy's personal guarantee of the loan, the surrender of the Property to

---

[27] Ltr. to the Court from J. Cline, Esq. dated Mar. 11, 2015, Ex. A (hereinafter "Privilege Log"). Although there are other versions of the privilege log in the record, this version is the most recent and reflects updated descriptions for some of the redacted documents. This is the version of the privilege log that I will refer to in this report.

satisfy a loan representing less than 5% of the appraised value of the Property, and the failure to provide any information to DDM's non-managing members since at least 2010. The books and records DDM previously produced in response to the Demand do not answer those questions, and the plaintiffs contend that the documents on the privilege log represent the best – and possibly only – way they may investigate possible mismanagement.

DDM vigorously disputes the plaintiffs' right to inspect the privileged documents, contending that the plaintiffs have failed to demonstrate both that the records are essential to their stated purpose and that there is good cause to apply the fiduciary exception to the attorney-client privilege. DDM argues there is no evidence of any possible mismanagement of the company, and that the surrender of the Property is nothing more than a reflection of the fact that the initial estimates of the value of the Property and its potential for development did not pan out, due at least in part to the financial crisis that began in 2008 and its affect on the availability of real estate financing.

During argument, one of the disagreements between the parties involved Jowdy's personal guarantee of the KSI loan, and whether – despite that guarantee – Jowdy's interests were aligned with the other members of DDM. Specifically, the plaintiffs contend that Jowdy had a personal incentive to allow DDM to forfeit the property, so KSI would not collect its judgment against Jowdy. DDM argues that

8

Baja owns 93% of DDM's membership interests and therefore was incentivized to maximize the value of the Property. The plaintiffs, however, contend the record is not clear regarding Baja's interest or what it stood to gain in the event of a sale of the Property and dissolution of the company. Under DDM's operating agreement, upon dissolution of DDM and payment of its third party obligations, DDM's net assets are to be distributed to "all of the Members in accordance with the positive balances in their respective Capital Accounts after giving effect to all Contributions, distributions and allocations for all periods."[28] According to the plaintiffs, the balance in each of the non-managing members' capital accounts is nearly $500,000 each, while Baja's is near zero.[29] Therefore, if – as DDM argued – the Property was not worth anything close to its 2005 appraised value, Baja would not have received any of the proceeds from a sale of the property unless the net proceeds – after payment of DDM's obligations – exceeded $7 million. DDM, on the other hand, argues that the plaintiffs misunderstand the operating agreement, because upon a sale of the Property the net proceeds first would have gone to repay any "net losses" to Baja's capital account, after which the members of DDM would have received their percentage interest in the proceeds.[30] Oddly, although DDM's

---

[28] Pls.' Br., Ex. C.
[29] Ltr. to Court from S. Stamoulis, Esq. dated Mar. 10, 2015.
[30] Ltr. to Court from J. Cline, Esq. dated Mar. 11, 2015.

argument assumes there were net losses to Baja's capital account, there is no documentation or explanation of those losses in the record.

The dispute between the parties is relatively narrow. DDM does not contend that the plaintiffs are not entitled to inspect books and records or that the plaintiffs have not stated a proper purpose for the inspection. The only issue before the Court is whether DDM may withhold as privileged the documents listed on the privilege log, or whether the "fiduciary exception" to the attorney-client privilege, first articulated by the Fifth Circuit in *Garner v. Wolfinbarger*[31] and expressly adopted by the Delaware Supreme Court, permits the plaintiffs to inspect DDM's privileged documents.

## I. ANALYSIS

In *Garner*, the Fifth Circuit Court of Appeals confirmed that the attorney-client privilege may be claimed by a corporation, even against its stockholders. The court recognized, however, that in suits between the corporation and its stockholders involving charges that corporate fiduciaries acted "inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the

---

[31] 430 F.2d 1093 (5th Cir. 1970).

10

particular instance."[32]  This fiduciary exception attempts to strike a balance between the privilege's purpose of encouraging open communication between counsel and client, and the right of a stockholder to understand what advice was given to fiduciaries who are charged with breaching their duties.[33]  To balance those competing interests, the Fifth Circuit in *Garner* adopted a "good cause" test that stockholders must meet to avoid a corporate claim of privilege.[34]  In its recent decision in *Wal-Mart Stores, Inc. v. Indiana Electrical Workers Pension Fund IBEW*, the Delaware Supreme Court for the first time expressly held that the *Garner* exception may apply in both plenary actions and in books and records actions, although the exception continues to be one that "is narrow, exacting, and intended to be very difficult to satisfy."[35]  In a books and records action, this Court must first consider whether the records at issue are necessary and essential to the stockholder's stated purpose for inspection.  Only if the Court determines the records meet that standard should it consider the "good cause" factors articulated

---

[32] 430 F.2d at 1103-04.

[33] *In re lululemon athletic, inc.*, 2015 WL 1957196, at *10 (Del. Ch. Apr. 30, 2015).

[34] *Garner*, 430 F.2d at 1104.

[35] *Wal-Mart Stores, Inc. v. Indiana Electrical Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1278 (Del. 2014).  On several previous occasions, this Court had applied the *Garner* doctrine, including in actions to inspect books and records.  *See, e.g. Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622 (Del. Ch. Nov. 13, 2002); *Grimes v. DSC Communications Corp.*, 724 A.2d 561 (Del. Ch. 1998); *Sealy v. Sealy Inc.*, 1987 WL 12500 (Del. Ch. Jun. 19, 1987).

in *Garner*.[36] DDM argues that the books and records listed on the privilege log are not necessary and essential to the plaintiffs' purpose, and, alternatively, that the plaintiffs have not met the burden of showing "good cause" to invade DDM's privilege. I will address each argument in turn.

**A. Certain of the records are necessary and essential to the plaintiffs' purpose.**

Determining whether the documents listed on the privilege log are "essential" to the plaintiffs' stated purpose is a threshold question that must precede any inquiry into the application of the *Garner* good cause analysis.[37] A document is "'essential' … if, at a minimum, it addresses the crux of the shareholder's purpose, and if the essential information the document contains is unavailable from any other source."[38] This inquiry depends on the context of a particular case.[39] It is the plaintiffs' burden to demonstrate that a document is "essential" to the inspection.

DDM argues that the plaintiffs have not met that burden because they only contend that the privileged documents would provide "additional insight" into the events that led to the surrender of the Property. DDM also asserts that the plaintiffs' stated purpose is to investigate the KSI loan and the encumbrance of the

---

[36] *Wal-Mart Stores, Inc.*, 95 A.3d at 1278; *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 374 (Del. 2011).
[37] *Wal-Mart Stores, Inc.*, 95 A.3d at 1278.
[38] *Espinoza*, 32 A.3d at 371-72.
[39] *Id.* at 372.

Property, which occurred in 2006, while the privileged documents were created between 2010 and 2014. The plaintiffs, on the other hand, argue that the non-privileged books and records produced by DDM do not address in any way the events that transpired after the settlement of the KSI Action, including the critical decisions that led to the loss of the Property and the associated loss of the plaintiffs' investment. The plaintiffs therefore argue that, unless they are permitted to inspect the privileged documents, they will have no way to assess whether Jowdy surrendered the Property (a) to advance his personal interests in satisfying the KSI debt, (b) because of mismanagement, or (c) as DDM contends, because outside factors associated with the economy generally and the real estate market particularly left DDM no alternative.

The documents on the privilege log – all of which the plaintiffs contend are necessary and essential to their stated purpose – fall within three general categories: (1) the documents relating to the KSI Action and its settlement, (2) the documents relating to post-settlement events, including the post-settlement negotiations and the transfer of the Property, and (3) the documents relating to this litigation. In my view, the plaintiffs only have demonstrated that the documents in the second category are essential to their stated purpose.

As to the first category, the plaintiffs' argument in their briefs exclusively focused on the necessity of inspecting documents regarding the events "following

[Jowdy's] settlement of the KSI [Action]."[40]  Although the plaintiffs retreated from that position during oral argument, and contended the documents relating to the KSI Action also are essential to their purpose, it is not apparent how those records address the crux of the plaintiffs' purpose, which is to investigate whether Jowdy's actions were self-interested or otherwise constituted mismanagement.  The plaintiffs concede that issues regarding the initial KSI loan in 2006 are not the focus of their investigation, and have not articulated a single reason why the settlement of the KSI Action constituted self-dealing or mismanagement.  Put another way, the plaintiffs do not contend that the KSI debt was not genuine or that Jowdy engaged in misconduct by settling the KSI Action.  Jowdy personally executed a confession of judgment in connection with the settlement, so there can be no contention he used the settlement to remove his personal liability for the KSI loan.  Plaintiffs have access to the settlement agreement to understand its terms.  Accordingly, the plaintiffs have not made the threshold showing that the privileged

---

[40] Pls.' Reply Br. in Supp. of Mot. to Compel ("Reply Br." at 4).  *See also id.* at 4 (privileged documents are the most essential to evaluating whether Jowdy breached his duties "following the settlement of the KSI [Action] in November of 2010."); *id.* at 5 ("Plaintiffs are still completely in the dark as to why Jowdy ultimately chose to surrender DDM's sole asset over a debt that represented less than 5% of its previously appraised value."); *id.* at 6 ("Frankly, in the absence of any actual evidence to support the conclusory assertion in DDM's Opposition, there are myriad of other possible reasons and explanations regarding why Jowdy ultimately surrendered the [P]roperty."); *id.* at 6 (explaining the plaintiffs do not know what efforts were made to refinance the $3 million loan or the pursue alternative options to protect the investments of DDM's members).

14

records created before the KSI Action was settled in November 2010 are essential to their purpose of investigating mismanagement.

Similarly, the privileged documents relating to this books and records action are not essential to the plaintiffs' purpose. There is no suggestion on the privilege log that those records relate to the issue of what happened after the settlement of the KSI Action or why the Property ultimately was surrendered to satisfy the KSI loan. Because how DDM chose to defend this action is unrelated to the plaintiffs' purpose, those records are not essential to the inspection.

In contrast, the plaintiffs have shown that the privileged documents created after the settlement of the KSI Action, other than those specifically related to this litigation, are essential to the inspection and in fact may be the only records that address the issue of what occurred after the settlement and why the Property was surrendered. Tellingly, DDM does not argue that the plaintiffs have access to this information from non-privileged documents. Notwithstanding the obligation to create and disseminate to DDM's members quarterly business reports, which likely would have kept the plaintiffs apprised in near-real time of the KSI Action and the issues regarding the KSI loan, DDM concedes that those reports were not provided or even prepared. The plaintiffs therefore have no other way to determine what efforts Baja or Jowdy undertook to save the members' investment, or whether Jowdy's interest in extinguishing his personal guarantee may have factored into the

decision to surrender the Property, which extinguished the value of the plaintiffs' interest in DDM.

DDM argues, however, that the plaintiffs have no legitimate complaint regarding Jowdy's potential conflict of interest, because Jowdy's interest in preserving Baja's stake in DDM would have substantially outweighed his interest in avoiding his obligations under the guarantee. This argument assumes too much based on the record before me. DDM argues without a sufficient record that a sale of the Property and dissolution of the company would result in a substantial payment to Baja based on its percentage ownership and losses to its capital account. DDM's argument, however, depends on its contention that there were net losses to Baja's capital account, a "fact" for which DDM provided no support. Given the posture of this case and the limited showing the plaintiffs must make to permit inspection, it is at least possible that Jowdy's interest in extinguishing his personal liability would outweigh the value of preserving Baja's interests in DDM. In so concluding, it also is significant that Jowdy took these actions without apprising DDM's members about them. This prolonged secrecy over a period of years lends credence to the plaintiffs' concerns about mismanagement. As explained below in connection with the "colorable claim" factor of the good cause analysis, I do not believe it is proper in an inspection action to weigh the strength of the plaintiffs' claims of mismanagement against other possible explanations for

16

the conduct, particularly because of the informational divide that separates the parties at this procedural stage.

Finally, DDM also argues that investigation of the post-settlement events and the ultimate surrender of the Property exceeds the scope of the purpose plaintiffs stated in the Demand. This game of "gotcha" comes with ill grace. Having effectively eliminated the informational rights of DDM's non-controlling members by failing to provide the regular updates required under the Operating Agreement, DDM now attempts to take advantage of that informational gap by criticizing the plaintiffs for failing to be more specific in their stated purpose. The plaintiffs were unaware when they made their Demand that the Property had been surrendered to satisfy the KSI loan. In my view, they should not be required to make a second demand to more specifically state an intent to investigate those actions, when their stated purpose of investigating possible mismanagement relating to the KSI loan and the encumbrance of the Property fairly may be read to include an investigation into how the loan and encumbrance ultimately caused DDM to surrender its only asset.

### B. The plaintiffs have shown good cause to inspect the post-settlement privileged books and records.

When the Delaware Supreme Court expressly adopted the *Garner* doctrine, it also adopted the factors identified in *Garner* as contributing to the analysis of

17

whether a stockholder has shown "good cause" to examine privileged documents.

The factors identified in *Garner* include:

> the number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.[41]

Of those factors, this Court historically has given the least weight to the percentage of a stockholder's ownership, reasoning that the "ownership factor" only will come into play when no other factor supports good cause.[42]  In contrast, the most important factors in the analysis often are the nature of the claim and whether it is obviously colorable, the apparent necessity or desirability of the stockholder having the information and the availability of it from other sources, and the extent to which the communication is identified as opposed to whether the stockholders are fishing blindly.[43]

---

[41] *Wal-Mart Stores, Inc.*, 95 A.3d at 1276 n.32 (quoting *Garner v. Wolfingarger*, 430 F.2d 1093, 1104 (5th Cir. 1970)).
[42] *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *13 (Del. Ch. Nov. 13, 2002).
[43] *Sealy Mattress Co. of New Jersey, Inc. v. Sealy Inc.*, 1987 WL 12500 (Del. Ch. Jun. 19, 1987).  *See also In re lululemon athletic, inc.*, 2015 WL 1957196 (Del. Ch. Apr. 30, 2015); *Grimes v. DSC Communications Corp.*, 724 A.2d 561, 570 (Del. Ch. 1998).

Of the eight factors identified in *Garner* as relevant to the good cause analysis, I view the first two factors (percentage of ownership and the "bona fides" of the stockholders) and the eighth factor (risk of revelation of trade secrets or other independently confidential information) as irrelevant to the analysis in this case. With respect to the remaining five factors, I believe all the factors are neutral or favor application of the fiduciary exception for the post-settlement privileged documents, other than those documents related to this litigation.

First, in an inspection action, the "colorable claim" factor considers whether the stockholder has stated an "obviously colorable" claim that justifies inspection. In *Wal-Mart*, the Supreme Court concluded the stockholder had stated an "obviously colorable" claim for bribery; in *lululemon* this Court considered whether the stockholder had stated an obviously colorable *Brophy* claim or claim for mismanagement. In my view, the consideration of whether the claim is obviously colorable must take into account the procedural posture and the relatively low showing necessary in an inspection action, which only requires a stockholder to state a "credible basis" from which the Court may infer possible mismanagement or wrongdoing.[44] Here, the plaintiffs have shown that DDM and

---

[44] *In re lululemon athletic, inc.*, 2015 WL 1957196, at * 11 & n.75; *Saito*, 2002 WL 31657622, at *13 ("plaintiff's purpose is to recoup any investment loss that may have been the result of breaches of fiduciary duty. Plaintiff seeks books and records to determine if there was wrongdoing involved with the merger, which is a colorable claim.")

Jowdy ignored the obligation under the Operating Agreement to provide quarterly and annual reports to the members, effectively leaving the plaintiffs in the dark for years while the KSI loan went unpaid and the company's only asset ultimately was surrendered to satisfy the loan. The balance on the loan was less than 5% of the value for which the Property appraised several years before it was surrendered, and the transfer of the Property had the effect of extinguishing a personal guarantee Jowdy made on the loan. Although DDM has articulated plausible alternative explanations for these events, the question of whether the plaintiffs have stated a "colorable" claim should not turn on whether the facts might ultimately demonstrate the absence of wrongdoing.[45] Rather, the plaintiffs have stated a credible basis from which the Court may infer possible mismanagement or wrongdoing, the plaintiffs have inspected non-privileged documents and have not found anything addressing the issues of what occurred after settlement that prompted Jowdy to surrender the Property, and it would be unfair on that record to require a more detailed showing of colorability.

The fourth factor, regarding the necessity of the plaintiffs' access and the availability of this information from another source, is addressed at length in the previous section. Suffice to say it weighs in favor of granting the plaintiffs access to the privileged documents. The fifth and sixth factors neither favor nor disfavor

---

[45] *See Khanna v. Covad Communications Group, Inc.*, 2004 WL 187274, at *6 (Del. Ch. Jan. 23, 2004).

granting the plaintiffs leave to invade DDM's privilege. Although the wrongful conduct alleged by the plaintiffs likely was not criminal, plaintiffs do contend that Jowdy acted in a manner inconsistent with his fiduciary obligations to DDM's members. Likewise, although the plaintiffs' motion to compel sought advice concerning this litigation, I already concluded those records are not necessary and essential to the stated purpose.

Finally, I do not believe inspecting the limited subset of documents on the privilege log that I concluded are necessary and essential – *i.e.*, those created after settlement of the KSI Action and not related to this litigation – would amount to a fishing expedition by the plaintiffs. Although the plaintiffs ideally would be able to further limit their inquiry to those communications specifically addressing the post-settlement negotiations and the surrender of the Property, the descriptions on DDM's privilege log do not allow the plaintiffs to more accurately pinpoint the documents they seek.[46] Nothing in the record allows the plaintiffs to more narrowly tailor their inquiry, but the records they seek fall within a limited number of documents and production will not be overly burdensome or require additional searches by the company.

---

[46] The log obliquely describes the documents at issue as relating to the "transfer of ownership of property with attorney comments," "legal advice re negotiations with KSI," or similar descriptions. *See* Privilege Log, Entry Nos. 22-39 and redactions from Aug. 2011 through 2012. Although these are not facially inadequate descriptions, they also do not lend themselves to a more targeted application of the *Garner* exception.

21

In sum, I conclude that the third, fourth, and seventh factors of the *Garner* analysis support allowing the plaintiffs to inspect the privileged documents, while the other factors either are irrelevant to the inquiry or are neutral as between the parties' positions. I therefore conclude the plaintiffs have met their burden of showing good cause to invoke the fiduciary exception to DDM's attorney-client privilege for those particular documents.

**CONCLUSION**

For the foregoing reasons, I recommend that the Court grant in part the plaintiffs' motion to compel and order DDM to allow the plaintiffs to inspect the documents identified on the privilege log and created after the settlement of the KSI Action, excluding those documents created in connection with this litigation. This is my final report and exceptions may be taken in accordance with Court of Chancery Rule 144.

/s/ *Abigail M. LeGrow*
Master in Chancery